# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| YELLOW CAB AFFILIATION, INC. and <br> WOLLEY CAB ASSOCIATION, INC., | ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) <br> ) | 10-cv-6896 |
| v. | ) <br> ) <br> ) | Judge Robert M. Dow, Jr. |
| NEW HAMPSHIRE INSURANCE COMPANY, <br> GRANITE STATE INSURANCE COMPANY, <br> and LEXINGTON INSURANCE COMPANY, | ) <br> ) <br> ) <br> ) <br> ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case concerns whether a dispute between insureds and their insurance companies are subject to binding arbitration. Before the Court is a motion [4] filed by Yellow Cab Affiliation, Inc. and Wolley Cab Association, Inc. ("Plaintiffs") seeking a declaratory judgment that the dispute is not arbitrable, and a preliminary and permanent injunction preventing New Hampshire Insurance Company, Granite State Insurance Company, and Lexington Insurance Company ("Defendants") from attempting to arbitrate the dispute.[1] Defendants seek antipodal relief, asking the Court to compel arbitration and dismiss Plaintiff's complaint [22]. For the reasons stated below, Defendants' motion [22] is granted and Plaintiff's motion [4] is denied; the dispute between the parties is referred to arbitration and Plaintiff's complaint is dismissed. Defendants' motion for an expedited ruling or in the alternative for the Court to lift its stay of the arbitration

---

[1] Plaintiffs' motion also requested a temporary restraining order. The day after Plaintiffs filed their complaint and motion, the Court entered and continued Plaintiffs' motion for a temporary restraining order pursuant to an agreement of the parties (see [12]).

[29] is denied as moot.

**I.  Background**[2]

Plaintiffs are taxi cab affiliations that operate in Illinois. (Cmplt. ¶ 19). Plaintiffs' members are independent medallion (taxi cab license) owners. (*Id*. at ¶ 20). As taxi cab affiliations, Plaintiffs provide their members with services which include radio dispatch, "colors," and insurance. (*Id*.). Plaintiffs collect dues from their members to cover the costs of these services. (*Id*. at ¶ 21). Defendants, as their names suggest, are insurance companies.

In late 2007, the parties began negotiating an automobile insurance policy for the 2008 year that would cover the fleet of taxis managed by Plaintiffs in Chicago. After extensive negotiations involving counsel for both parties, the parties agreed to an insurance program that provided $350,000 of coverage per claim with a $150,000 per claim deductible to be borne by Plaintiffs. (*Id*. at ¶ 23; Declaration of Frank K. Pawlikowski ("Pawlikowski Declaration") [24, Ex. 1, at ¶ 3]). The agreement was memorialized in a "Claims Service Agreement" ("CSA"). The parties later agreed to an identical insurance policy for the 2009 year, with an identical CSA. (Cmplt. ¶¶ 23-24).

---

[2] The Court takes the relevant facts from Plaintiffs' complaint [1] and from the affidavits and associated materials filed by each party. In their reply [27, at 3 n.2], Plaintiffs argue in passing that Defendants have "inundate[d] the Court with inadmissible parol evidence to improperly advance their misguided views." Plaintiffs have not moved to strike any materials filed by Plaintiffs or identified which materials they consider to be objectionable. Regardless, the Court clarifies that it may consider the affidavits and associated exhibits as background facts in ruling on the instant motions. Plaintiffs have filed a motion for preliminary and permanent injunction, and Defendants are of course entitled to submit evidence in response to such a motion. Furthermore, even if the Court were only considering Defendants' motion to compel arbitration, consideration of the affidavits still would be proper. Courts treat motions to compel arbitration as assertions that they are deprived of subject matter jurisdiction during the course of arbitration. *Reineke v. Circuit City Stores*, 2004 WL 442639, at *1 (N.D. Ill. Mar. 8, 2004) (citing *Robert Half Int'l, Inc. v. Thompson*, 1999 WL 138849, at *1 (N.D. Ill. Mar. 5, 1999)). Accordingly, courts draw the background facts for deciding such a motion from the parties' pleadings, but will also consider attached exhibits and affidavits. *Id*. Where the facts are in dispute, courts accept the plaintiff's version. *Tumock v. Cope*, 816 F.2d 332, 333 (7th Cir. 1987).

The first paragraph of the CSA[3] provides that the agreement is "by and among the insurance company named on the signature pages hereto (the "Insurer"), Peter Corrick & Associates (the "Third Party Administrator"), Michael J. Levine and Patton R. Corrigan (the "Owners"), and Yellow Cab Affiliation, Inc., Wolley Cab Association, Inc. which also does business as Checker Taxi Affiliation, Inc. and Blue Diamond Taxi Association, Inc. (the "Insured")." A number of signature pages appear at the end of each of the agreements, in which representatives for both Plaintiffs and Defendants signed.[4] The first page of the CSA also contains a number of preliminary recitals, each beginning with the word "WHEREAS." The last recital reads "NOW, THEREFORE, the Third Party Administrator and the Insurer, subject to the following terms, conditions and limitations, agree as follows: * * *."

Article II of the CSA appoints a Third Party Administrator ("TPA") to administer all claims made against the policies. Article I of the first contract ("Term") provides that the TPA agrees to provide services for all "claims occurring * * * during the period commencing January 1, 2008 at 12:01 a.m. and ending January 1, 2009 at 12:00 a.m., Eastern Time." The second contract covers the 2009 year.

---

[3] Because the 2008 CSA and 2009 CSA are identical, for the sake of clarity, the Court will use the singular "CSA" where appropriate when discussing the contracts.

[4] Defendant New Hampshire Insurance Company signed the 2008 CSA and Defendant Granite State Insurance Company signed the 2009 CSA. Defendant Lexington Insurance Company ("Lexington") was not a party to either of the contracts and accordingly did not sign either agreement. Lexington was, however, listed as one of the claimants in Defendants' initial claim for arbitration which was filed with the American Arbitration Association ("AAA") on October 7, 2010. One of Plaintiffs' challenges to the arbitration filed by Defendants is that Lexington cannot demand arbitration, as it was not party to the contracts that contained the arbitration clause. (Pl. Mem. [5] at 9). Defendants have conceded that point and filed an amended demand for arbitration with the AAA that removes Lexington as a claimant. (See Declaration of Adam J. Kaiser, Ex. 1 to Defendants' Memorandum in Further Support of their Motion [28]). Plaintiffs also took issue with the fact that "People Mover, Inc." and "Yellow Cab Partners LLC" were named as respondents in the initial demand for arbitration despite the fact that neither entity was party to the CSA. (Pl. Mem. at 9). Defendants have removed these entities from their amended demand for arbitration as well. Accordingly, the Court need not discuss these arguments in any further detail.

The CSA provided for the establishment of two bank accounts that would be used to effectuate the processing of claims. Article VI, Sec. J of the CSA required the TPA to establish a "Loss Fund Account," in which Defendants would deposit monies which the TPA would use to pay claims. However, as noted above, Plaintiffs were responsible for paying the first $150,000 of each claim. To ensure that sufficient funds would be available to reimburse Defendants for the first $150,000 of each claim, the CSA provided for the establishment of the "Collateral Account" (called the "Deductible Reimbursement Account" in the CSA). (Cmplt. ¶ 25; CSA Art. VI, Sec. U-V). It is the Collateral Account that is the subject of the instant dispute.

Article VI, Sec. V controlled how the Collateral Account was to be funded. Plaintiffs were required to initially fund the account with $750,000, followed by 11 monthly payments of $314,000 each, for a total sum of $4,204,000 to be paid during the coverage term of each policy. Section V further provided that this amount may be increased: "As a consequence of claims experience during the policy term, the Insurer may require that the monthly installment amount be increased in order to maintain a Deductible Reimbursement Account balance during the term of the policy of not less than [$750,000] or such other minimum balance as may be required to provided adequate reserves for reimbursement of policy deductible payments based on claims experience." The parties agree that the foregoing parts of Section V pertain to the payments Plaintiffs were required to make during the policy term – *i.e.* either in 2008 or 2009 – depending on the applicable policy.

However, Article VI, Sec. V of the CSA continues, with the following:

In addition, in the event that the total sum of the following shall exceed [$4,204,000], the Owners and the [Plaintiffs] shall either immediately make payment of such excess amount directly to [Defendants], or to the [TPA] for deposit into the Deductible Reimbursement Account, or per instructions obtained from the [TPA], make a direct deposit of such amount to the Deductible Reimbursement Account by wire transfer or other method acceptable to the

4

[TPA], [Plaintiffs] and the bank in order to increase the minimum balance of the Deductible Reimbursement Account by the amount of such excess:

    i. the amount of loss and/or expense amounts below the policy deductible paid by [Defendants] or [TPA] in excess of the Loss Fund Account but not reimbursed by or on behalf of [Plaintiffs] or other responsible party to the [TPA] from the Deductible Reimbursement Account or otherwise.

    plus

    ii. the amount of outstanding Reserves (as defined by the policy and/or the Claims Service Agreement) established by the [TPA].

Defendants contend that this quoted portion of Section V of Article VI requires Plaintiffs to continually fund the Collateral Account to ensure sufficient funds for the reimbursement of deductibles, even after the 2008 and 2009 policy coverage terms have ended.

During 2008 and 2009, Plaintiffs paid approximately $8.4 million into the Collateral Fund Account, in accordance with Article VI, Section V.[5] (Pawlikowski Declaration at ¶ 15). Since 2008 and 2009, thousands of claims have been filed against the insurance policies. (*Id*. at ¶ 17). In accordance with the provisions of the CSA, the TPA has overseen the processing of many of these claims, and has paid money out of the Collateral Account to reimburse Defendants for the deductibles they advanced on those claims. However, many claims remain outstanding and unpaid. (*Id*.).

At some point in 2010, Plaintiffs stopped paying monies into the Collateral Account. In April 2010, Defendants began demanding that Plaintiffs pay $4,403,000 into the Collateral Account, but Plaintiffs refused. In September 2010, Plaintiffs placed $500,000 in the Collateral Account (Pawlikowski Declaration at ¶ 21); however Plaintiffs have refused to pay the full amount requested by Defendants. As of January 21, 2011, there was only $621 remaining in the

---

[5] The 2009 policies were not renewed, and after January 1, 2010, Defendants are no longer insuring Plaintiffs' fleet of taxi cabs. (Pawlikowski Declaration at ¶¶ 6, 10).

Collateral Account. (Declaration of James A. Ross, Jr., Ex. B to Defendants' motion for an expedited ruling [29]).

On October 7, 2010, Defendants filed their initial demand for arbitration with the AAA. The demand was based on the arbitration clause found at Article XIX of the CSA. The broadly-worded arbitration clause provides that "[a]ny and all disputes or differences arising out of or relating to this Agreement, including those relating to its formation, validity, or breach, shall be resolved by binding arbitration governed by the published Commercial Arbitration Rules of the American Arbitration Association, including, if applicable, the Supplementary Procedures for Large, Complex Commercial Disputes, in effect on the date of this Agreement (the "Rules"), subject to the provisions of this Article XIX." (CSA, Art. XIX, Sec. A). The last section of the arbitration provision provided in part that "[t]he parties agree that the provisions of this Article XIX shall survive any termination of this Agreement." (CSA, Art. XIX, Sec. H).

Plaintiffs advance three arguments in their attempt to avoid the arbitration clause found in the CSA. First, Plaintiffs contend that they are not "parties to the Agreement" and hence are not bound to arbitrate. (Pl. Mem. [5] at 8). In support of this argument, Plaintiffs rely on the fact that the last recital (see, *supra*. at pg. 3) provides that the "Third Party Administrator and the Insurer * * * agree as follows: * * *"; the phrase does not include Plaintiffs. Second, Plaintiffs contend that each CSA has "expired," and the arbitration clause found in the CSA did not survive the agreement's expiration. (*Id*. at 7-8). In support of this argument, Plaintiffs point to Section H of the arbitration clause, which provides that the agreement to arbitrate "shall survive any termination of this Agreement." Plaintiffs contend that the CSAs were not "terminated," but rather expired by their own terms. Third, Plaintiffs argue (for the first time in their reply memorandum) that because Defendants' demand for arbitration shows that the harm Defendants

6

seek to remedy is only speculative, Defendants have no chance of success in the underlying arbitration and it would therefore make no sense for the Court to allow Defendants to arbitrate a claim that they could not possibly win. (Pl. Reply [27] at 2, 12-14).

## II. Analysis

The question presented to the Court by the parties' motions is whether their dispute regarding the funding of the Collateral Account is subject to arbitration. In contracts governed by the Federal Arbitration Act ("FAA"),[6] this threshold question of arbitrability is generally to be decided by the court, not the arbitrator, unless the parties "'clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649 (1986)); see also *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). In an order entered shortly after Plaintiffs filed their motion to enjoin the arbitration, the Court pointed out that the broad arbitration clause at issue in this case specifically incorporates the AAA Commercial Arbitration Rules by reference. (Order of Nov. 5, 2010 [16], at 2). Among those rules is Rule 7(a), which provides that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." As discussed in detail below, numerous federal courts have held that by specifically

---

[6] The FAA applies to all contracts which involve interstate commerce. 9 U.S.C. § 2; *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265 (1995); see also *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967) (holding that the FAA applies in federal court to diversity suits which relate to contracts involving interstate or international commerce). Defendants assert that the FAA controls in this case because the dispute involves interstate commerce, and Plaintiffs have not challenged this assertion. (Def. Mem. [24] at 9). While the CSA does include a choice of law provision specifying that the agreement shall be governed by New York law, the CSA does not contain language evidencing any intent of the parties to specifically opt out of the FAA in favor of the New York arbitration code. See *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63-64 (1995); *BEM I, L.L.C. v. Anthropologie, Inc.*, 2000 WL 1849575, at *6 (N.D. Ill. Dec. 15, 2000) ("*Mastrobuono* has been read to mean that a general choice of law provision in a contract will not extend to the arbitration clause, absent specific evidence the parties intended it to do so.") (citation omitted).

incorporating the AAA rules, the parties to an agreement to arbitrate provide clear and unmistakable evidence to show that they intended the arbitrator to decide the threshold question of arbitrability. Accordingly, the Court asked the parties to address in their briefs "the threshold question of whether the Court or the panel of arbitrators should decide the threshold question of whether this dispute is arbitrable." (Order of Nov. 5, 2010, at 1).

Having carefully reviewed the parties' briefs and the cases cited therein, the Court finds that by specifically incorporating the Commercial Arbitration Rules of the American Arbitration Association into their agreement, the parties clearly and unmistakably evidenced their intention to grant the arbitrator the authority to determine whether their dispute is arbitrable. Defendants have cited numerous court of appeals and district court decisions that hold that by incorporating the AAA rules, the parties evidence their intent to leave questions of arbitrability to the arbitrator. See, *e.g. Bayer CropScience, Inc. v. Limagrain Genetics Corp., Inc.*, 2004 WL 2931284, at *4 (N.D. Ill. Dec. 9, 2004); *Contec Corp. v. Remote Solution, Co., Ltd.*, 398 F.3d 205, 211 (2d Cir. 2005); *Fallo v. High-Tech Institute*, 559 F.3d 874, 878 (8th Cir. 2009); *Ariza v. Autonation, Inc.*, 317 Fed. Appx. 662, 664 (9th Cir. 2009); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006); *Terminix Int'l Co. v. Palmer Ranch LP*, 432 F.3d 1327, 1332 (11th Cir. 2005); *Apollo Computer, Inc. v. Berg*, 886 F.2d 469, 472-73 (1st Cir. 1989); see also (Def. Mem. at 8-9 n.5 (collecting additional cases)). The Court agrees with Defendants that the cases which apply this majority rule are "legion," (Def. Mem. at 8), and that the rationale underlying the rule is sound.

Plaintiffs, for their part, admit that "a number of courts have found that mere reference to the AAA Commercial Rules divests the court of jurisdiction over the threshold question of arbitrability." (Pl. Reply [27] at 4). However, in contending that the Court should not apply this

majority viewpoint, Plaintiffs offer no argument or rationale as to why that approach is incorrect. Instead, Plaintiffs cite four state court cases as examples of "other courts [that] have declined" to find that incorporation of the AAA rules is clear and unmistakable evidence of an intent to leave arbitrability to the arbitrator. These cases are neither binding on this Court nor persuasive.[7] Accordingly, the Court concludes that the parties have conferred on the panel of AAA arbitrators the authority to determine its own jurisdiction, including the power to resolve any "objections with respect to the existence, scope or validity of the arbitration agreement." AAA Commercial Arb. R. 7(a).[8]

However, reaching this conclusion does not end the matter. Plaintiffs' first argument is that they were not parties to the CSA. That argument does not challenge the validity of the

---

[7] The four cases that Plaintiffs identify certainly do not establish the existence of a competing body of case law that does not consider incorporation of the AAA rules to be sufficient to set aside the issue of arbitrability for the arbitrator. For example, Plaintiffs cite to and rely heavily on *Willie Gary, LLC v. James & Jackson, LLC, C.A.*, 2006 WL 75309, at *6 (Del. Ch. Jan. 10, 2006), in which a Delaware Chancery Court rejected the federal decisions cited above and found that it had jurisdiction to determine whether a dispute was arbitrable, despite a reference to the AAA rules in the parties' agreement. Plaintiffs fail to mention, however, that the Delaware Supreme Court reversed the Chancery Court on this very point. *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 80 (Del. 2006). The Texas case to which Plaintiffs cite, *Burlington Resources Oil & Gas Company LP v. San Juan Basin Royalty Trust*, 249 S.W.3d 34 (Tex. Ct. App. 2007), does not support Plaintiffs' position either. There, the court took pains to note its general agreement with the approach adopted in *Contec*, *Qualcom*, *Terminix*, and *Citifinancial*; the Texas court's ruling was specifically "based on the express terms of the Arbitration Agreement before us" which had "restricted the arbitrator's reach only to specifically identified" issues. See *id.* at 40-41. The Court has identified two federal decisions in which a court has held that incorporation of the AAA rules did not constitute clear and unmistakable evidence of the parties' intent for issues of arbitrability to be decided by the arbitrator. See *Diesselhorst v. Munsey Building, L.L.L.P.*, 2005 WL 327532 (D. Md. Feb. 9, 2005); *Martek Biosciences Corp. v. Zuccaro*, 2004 WL 2980741 (D. Md. Dec. 23, 2004). The Court finds these decisions to be in the distinct minority and respectfully is not persuaded to follow them.

[8] Plaintiffs argue (for the first time, in their Reply) that the CSA is a "contract of adhesion" and therefore the incorporation of the AAA rules should not be accepted as evidence of the parties' true intent. (Pl. Reply at 6). Plaintiffs have introduced no evidence whatsoever that the CSA is a contract of adhesion, while Defendants' witness submits that the CSA was the product of extensive negotiations involving counsel for both parties (Pawlikowski Declaration [24, Ex. 1] at ¶ 3). Accordingly, the Court gives Plaintiffs' unsupported assertion that the CSA was a "contract of adhesion" no weight.

9

arbitration clause alone or contend, for example, that the instant dispute is not covered by Section XIX. Instead, this argument goes to the foundational question of "whether a contract existed between the parties." *Janiga v. Questar Capital Corp.*, 615 F.3d 735, 742 (7th Cir. 2010). For, if Plaintiffs were not a party to the contract that contained the agreement to arbitrate (or were not otherwise bound by the agreement to arbitrate, see *Zurich American Ins. Co. v. Watts Industries, Inc.*, 417 F.3d 682, 687 (7th Cir. 2005)), the AAA arbitrators would have no power to determine any issues regarding Plaintiffs' rights, including whether their dispute with Defendants is arbitrable. Accordingly, while the parties have empowered the arbitrators to rule on their own jurisdiction, including the power to resolve any "objections with respect to the existence, scope or validity of the arbitration agreement," the "narrow question [of] whether a contract existed between the parties," *Janiga*, 615 F.3d at 742, is for the Court to decide.[9]

Accordingly, the Court will now determine whether Plaintiffs were parties to the CSA – a question that turns on an application of state law. See *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Whether the law of New York (as specified in the CSA) or the law of Illinois controls this determination is of no import, as there is no difference between

---

[9] In *Janiga*, the plaintiff (a Polish immigrant with only limited English language skills) signed a contract with a securities broker-dealer that contained an arbitration clause. 615 F.3d at 737. Janiga argued that no contract existed between himself and the defendant because he did not and could not read the document which he signed. The district court decided that it could not order arbitration immediately because it was not clear whether a contract between Questar and Janiga even existed. The Seventh Circuit reversed, finding that there were sufficient facts in the record to find that a contract existed between the parties. *Id*. at 742. However, the Seventh Circuit agreed with the district court's conclusion that it was the "court's job [as opposed to the arbitrator's] to decide whether a contract exists." *Id*. at 741; see also *id*. (discussing *Granite Rock Co. v. International Brotherhood of Teamsters*, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010) ("[i]t is similarly well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide.")); *Sphere Drake Ins. Ltd. v. All Am. Ins. Co.*, 256 F.3d 587, 591 (7th Cir. 2001) (holding that "as arbitration depends on a valid contract an argument that the contract does not exist can't logically be resolved by the arbitrators"); *Gibson v. Neighborhood Health Clinics*, 121 F.3d 1126 (7th Cir. 1997) (addressing the argument that a promise lacked consideration as a judicially-determined issue).

the laws of those states that would be dispositive.[10]

As an initial matter, Plaintiffs appear to have abandoned the argument that they were not parties to the CSA in their Reply. (See Pl. Reply [27]). Regardless, the Court's review of the CSA clearly shows that Plaintiffs clearly were parties to the agreement.

A party's status with respect to a contract depends on the intention of the parties as expressed by the language of the document and the circumstances surrounding the parties at the time of its execution. *Smith v. Clark Equipment Co.*, 483 N.E. 2d 1006, 1009 (Ill. App. Ct. 1st Dist. 1985). Contracts should be read as a whole, and the "intent of the parties is not to be gathered from detached portions of a contract or from any clause or provision standing by itself." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007); see also *Aquavella v. Viola*, 2010 WL 539488479, at *3 (N.Y. App. Div. 4th Dept. Dec. 30, 2010) ("a contract must be read as a whole to determine its purpose and intent and it should be interpreted in a way [that] reconciles all its provisions, if possible. * * * Effect and meaning must be given to every term of the contract and reasonable effort must be made to harmonize all of its terms.") (internal citations omitted).

Here, the very first paragraph of the CSA identifies Plaintiffs as parties to the agreement. Additionally, Plaintiffs' signed each agreement. These facts alone are enough for a Court to find that Plaintiffs were parties to the agreements. See *Janiga*, 615 F.3d at 743 ("Even if we limit our review to the one page that Janiga signed, it is impossible to avoid the conclusion that he agreed to arbitration."). But the Court need not focus on these facts alone, as reading the contract as a whole indisputably shows that Plaintiffs were parties to it. Not only is the CSA's very purpose to benefit Plaintiffs, but the CSA it is replete with obligations that it imposes on Plaintiffs. For

---

[10] Plaintiffs cite Illinois law in their briefs; Defendants cite New York law. The Court has relied on the law of both jurisdictions.

example, the CSA requires Plaintiffs to fund the Collateral Account and to pay the TPA's fees. Plaintiffs' actions have demonstrated that they consider themselves bound by these provisions— Plaintiffs cannot explain why they would have paid $8.4 million into the Collateral Account if they were not parties to the CSA and thereby required by the contract to do so. In fact, Plaintiffs acknowledge in their brief that the CSA *does* impose some duties on them (see Pl. Mem. at 4 (contending that Plaintiffs "merely signed to acknowledge [their] obligation to pay the TPA's fees") yet fail to explain how an agreement could impose duties on a non-party.

Plaintiffs' only support for their argument that they are not parties to the CSA is that the "WHEREAS" clauses appearing at the first page of each CSA do not mention Plaintiffs and the "NOW THEREFORE" clause ending the recitals provides that "the Third Party Administrator and the Insurer * * * agree as follows." These isolated, introductory recitals alone cannot control. Initially, "it is a basic principle of contract construction that where two clauses conflict, it is the duty of the court to determine which of the two clauses most clearly expresses the chief object and purpose of the contract." *Harris Trust & Sav. Bank v. Hirsch*, 445 N.E. 2d 1236, 1240 (Ill. App. Ct. 1st Dist. 1983). As demonstrated above, the agreement as a whole (coupled with Plaintiffs' signatures) clearly demonstrates that Plaintiffs were intended to be parties and bound by the CSA's provisions. Further, we are not here dealing with two operative clauses that are in direct conflict. The language on which Plaintiffs hang their hat appears in the preliminary recital clauses of the agreement. Under both Illinois and New York law, courts give recitals less weight than operative parts of the contract. *Brookens v. Peabody Coal Co.*, 143 N.E.2d 25, 27 (Ill. 1957) ("Generally, the recognized rule is that the obligations and promises of the parties in the operative portion of a contract prevail over a preliminary recital or preamble."); *Andersen v. Weinroth*, 849 N.Y.S.2d 210, 219 (N.Y. App. Div., 1st Dept 2007); *Utils. & Indus. Corp. v.*

*Palisades Interstate Park Comm'n*, 258 N.Y.S.2d 700, 711-712 (N.Y. Sup. Ct. 1965) ("Where both the recitals and the operative clauses are clear, though inconsistent with each other, the operative part must control since it is the most important."). Accordingly, the Court concludes that Plaintiffs were parties to both the 2008 and the 2009 CSA.

Having found that Plaintiffs were parties to the CSA, the Court can now hand the reins to the panel of AAA arbitrators. Plaintiffs' second argument is that the CSA has "expired" and the arbitration provision contained within it did not survive the CSA's expiration. Resolving that issue would require the Court to go beyond the "narrow question [of] whether a contract [ever] existed between the parties," *Janiga*, 615 F.3d at 742, and instead more broadly determine whether the panel of AAA arbitrators have jurisdiction to decide the parties' dispute. In light of the parties' incorporation of the AAA Commercial Arbitration Rules, Plaintiffs' second argument is one for the arbitrators to resolve. *Beidleman v. McDougal Littell*, 2006 WL 2425321, at *3 (N.D. Ill. Aug. 21, 2006) (argument that agreement containing arbitration clause had "expired" was reserved for decision by arbitrator in light of the agreement's incorporation of AAA rules).[11]

Plaintiffs' third argument would be similarly inappropriate for this Court to address. Again, Plaintiffs argue that because Defendants' demand for arbitration shows that the harm Defendants seek to remedy is only speculative (the funds in the Collateral Account have not yet run completely dry), Defendants have no chance of success in the underlying arbitration and it

---

[11] Even in cases where the parties have not specifically empowered the arbitrator to determine his own jurisdiction, courts have left questions of whether an agreement to arbitrate has expired or terminated for the arbitrator to determine. See, *e.g. Teamsters Local Union No. 89 v. Kroger Co.*, 617 F.3d 899, 906-907 (6th Cir. 2010) (quoting *Int'l Ass'n of Bridge, Structural, and Ornamental Iron Workers, Local Union No. 44 v. J & N Steel & Erection Co.*, 8 Fed.Appx. 381, 386 (6th Cir. 2001) ("'where the dispute turns not on whether the parties ever agreed to arbitrate, but rather whether an agreement to arbitrate has expired or terminated, the question of termination is for the arbitrator.'").

would make no sense for the Court to allow Defendants to arbitrate a claim that they could not possibly win. (Pl. Reply at 2, 12-14). Considering such an argument would require the Court to perform an assessment of the underlying claims in Defendants' demand for arbitration, which the Court may not do.

Plaintiffs' complaint seeks only a declaratory judgment that "the dispute over the Collateral Account * * * is not arbitrable" and an injunction against the arbitration filed by Defendants. (See Complt. at ¶ 61). The Court has determined that because a contract containing an arbitration clause (which in turn incorporated the AAA Rules) existed between Plaintiffs and Defendants, it is up to the arbitrator to determine whether the dispute is arbitrable. Because this opinion resolves all of the issues raised in Plaintiffs' complaint, dismissal is the appropriate disposition. See *Hostmark Investors Ltd. v. Geac Enterprise Solutions, Inc.*, 2002 WL 1732360, at *3 (N.D. Ill. 2002) (quoting *U.S. & Int'l Travel & Tours v. Tarom*, 98 F.Supp.2d 979, 981 (N.D. Ill. 2000) ("'[t]he weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration.'") (collecting cases)). And because Plaintiffs' motion for injunctive relief [4] has no chance of success, it too is denied. See, e.g., *Cox v. City of Chicago*, 868 F.2d 217, 223 (7th Cir. 1989) (if a plaintiff fails to demonstrate any likelihood of success on the merits, the motion for preliminary injunction must be denied).

One final matter: In their memorandum in further support of their motion ([28] at 13), Defendants ask the Court to order arbitration immediately but to delay dismissal and termination of the case "to allow time for [Defendants] to seek sanctions against [Plaintiffs] for filing this frivolous lawsuit and application for an injunction." Having decided that dismissal is the appropriate course, the Court need not delay. Under Supreme Court precedent, if Defendants believe that they can satisfy the "high burden of showing that Rule 11 sanctions are warranted"

*Lundeen v. Minemyer*, 2010 WL 5418896, at *3 (N.D. Ill. Dec. 17, 2010) (citing *Federal Deposit Ins. Corp. v. Tekfen Const. and Installation Co., Inc.*, 847 F.2d 440, 444 (7th Cir. 1998)), Defendants may file a motion for sanctions even after the Court terminates Plaintiffs' case. "Like the imposition of costs, attorney's fees, and contempt sanctions, the imposition of a Rule 11 sanction is not a judgment on the merits of an action. Rather, it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate. Such a determination may be made after the principal suit has been terminated." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396-97 (1990).

### III. Conclusion

For the reasons stated above, Plaintiffs' motion for a declaratory judgment, temporary restraining order, preliminary injunction, and permanent injunction [4] is denied. Defendants' motion to compel arbitration and dismiss the complaint [22] is granted; the dispute between the parties is referred to arbitration. Plaintiff's complaint [1] therefore is dismissed, and the case is terminated. Defendants' motion for an expedited ruling or in the alternative for the Court to lift its stay of the arbitration [29] is denied as moot.

Dated: January 28, 2011

Robert M. Dow, Jr.
United States District Judge